TEXAS & P. RY. CO. v. RIGSBY.

(Circuit Court of Appeals, Fifth Circuit.   April 29, 1915.)

No. 2638.

1. COMMERCE ☞27—REGULATION—SAFETY APPLIANCE ACT—VALIDITY.
   Congress may, as a means of securing the safety of persons and property transported in interstate commerce, prohibit, as is done by Safety Appliance Act March 3, 1893, c. 196, 27 Stat. 531 (Comp. St. 1913, §§ 8605–8612), the movement of a defective car, unless necessary to move it to a repair point, though the movement is not an act of interstate commerce, nor a use of the car in interstate commerce.
   [Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ☞27.]

2. COMMERCE ☞27—REGULATION—SAFETY APPLIANCE ACT—MOVING DEFECTIVE CAR.
   Where a switchman, employed by a carrier engaged in interstate commerce, was injured because of a defective rung or grabiron constituting the ladder to the top of a box car, which at the time was standing on the main line at a point while switching was going on which was required to complete a movement previously started of that with other cars, from another track in the yard, to the carrier's repair shop at that point, but there was nothing to prove that the defect could not have been repaired or removed without making the movement of the car which had been partially executed when the injury occurred, the carrier was liable under the Safety Appliance Act.
   [Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. ☞27.]

   Pardee, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of Texas; Gordon Russell, Judge.

Action by A. R. Rigsby against the Texas & Pacific Railway Company. There was a judgment for plaintiff, and defendant brings error. Affirmed.

F. H. Prendergast, of Marshall, Tex., for plaintiff in error.
S. P. Jones, of Marshall, Tex., for defendant in error.

Before PARDEE and WALKER, Circuit Judges, and CALL, District Judge.

WALKER, Circuit Judge. [1] We understand that the provisions of the Safety Appliance Act are made applicable to any common carrier engaged in interstate commerce by railroad, that that act forbids such carrier to haul or to permit to be hauled or used on its line any car defective in a particular specified in the act, and penalizes such a movement unless it is one from a place where the equipment was first discovered to be defective or insecure to the nearest available point where such car can be repaired, even that movement being penalized unless it is necessary to get the required repairs made, and such repairs cannot be made except at such repair point. And we understand that the civil liability which may result from a violation of the act attaches if the movement of the car is a prohibited one, though it is not

one which subjects the carrier to the criminal penalty prescribed by the act. U. S. Comp. St. 1913, §§ 8605, 8613, 8617, 8618, 8621, 8622. The hauling of such a car over the line of such a carrier is within the prohibition of the act, though that movement does not constitute a use of the car in interstate commerce. It was a purpose of the statute to prevent the movement of such a car over such a line. Congress had the power to prescribe this prohibition as a means of securing the safety of persons and property transported in interstate commerce. Southern Railway Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72. The prohibited movement need not be an act of interstate commerce in order to render the carrier civilly liable to one injured as a result of the car being defective in a particular specified in the act. In this respect there is a marked difference between the Safety Appliance Act and the Employers' Liability Act (Act April 22, 1908, c. 149, 35 Stat. 65 [Comp. St. 1913, §§ 8657–8665]).

[2] The evidence in this case was without conflict to the effect that the injury to the defendant in error, a switchman employed by the plaintiff in error, a common carrier engaged in interstate commerce by railroad, was due to the defective condition of one of the rungs or grabirons constituting the ladder to the top of a box car which at the time was standing on the plaintiff in error's main line at Marshall, Tex., while switching was going on which was required to complete a movement previously started of that with other cars from another track in the yard to the plaintiff in error's repair shop at that place. There was an absence of evidence tending to prove that the defect which caused the injury could not as well have been repaired or removed without making the movement of the car which had been partially executed when the injury occurred. We are of opinion that the evidence showed a right of recovery in the defendant in error, and that there was no reversible error in any ruling complained of.

It follows that the judgment should be affirmed; and it is so ordered.

PARDEE, Circuit Judge (dissenting). The first section of the act of March 2, 1893 (27 Stat. at Large, c. 196, p. 531), provides that after the 1st day of January, 1898:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power-driving * * * brake and appliances * * * operating the train-brake system," etc.

Section 2 of the same act provides that after the same date:

"It shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

Section 4 of the same act providing for safety appliances, grabirons, etc., provides that:

"It shall be unlawful for any railroad company to use any car in interstate commerce that is not provided with secure grabirons or handholds in the ends and sides of each car for greater security to men in coupling and uncoupling cars."

With this statute in force, and referring to the same by act approved March 2, 1903 (32 Stat. at Large, c. 976, p. 943), it was provided that the above-mentioned act of March 2, 1893, "shall be held to apply to common carriers by railroads in the territories and in the District of Columbia and shall apply in all cases, whether or not the couplers brought together are the same kind, make or type," and, further, "that the provisions and requirements hereof and of said acts" (referring to act of March 2, 1893, and amendment of April 1, 1896, amendment, however, not pertinent here) relating to train brakes, automatic couplers, grabirons, and the height of drawbars, "shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, and in the territories and District of Columbia, and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith."

It was these provisions that were under consideration in Southern Railway Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72, which was a case in which cars were hauled over a railroad engaged in interstate commerce, part of the cars involved being loaded with interstate traffic and part intrastate traffic, and all charged with having defective couplers. In that case the Supreme Court held that the original act, as enlarged by the amendatory one, is intended to embrace all locomotives, cars, and similar vehicles USED (capitals mine) on any railroad which is a highway of interstate commerce. The word "used" refers to use in moving interstate traffic, as well as in moving intrastate traffic, for just following, in considering the question of the constitutionality of the act as so interpreted, the court said:

"We come, then, to the question whether these acts are within the power of Congress under the commerce clause of the Constitution, considering that they are not confined to vehicles used in moving interstate traffic, but embrace vehicles used in moving intrastate traffic. The answer to this question depends upon another, which is: Is there a real or substantial relation or connection between what is required by these acts in respect of vehicles used in moving intrastate traffic and the object which the acts obviously are designed to attain, namely, the safety of interstate commerce and of those who are employed in its movement? Or, stating it in another way: Is there such a close or direct relation or connection between the two classes of traffic, when moving over the same railroad, as to make it certain that the safety of the interstate traffic and of those who are employed in its movement will be promoted in a real or substantial sense by applying the requirements of these acts to vehicles used in moving the traffic which is intrastate as well as to those used in moving that which is interstate? If the answer to this question, as doubly stated, be in the affirmative, then the principal question must be answered in the same way. And this is so, not because Congress possesses any power to regulate intrastate commerce as such, but because its power to regulate interstate commerce is plenary, and competently may be exerted to secure the safety of the persons and property transported therein and of those who are employed in such transportation, no matter what may be the source of the dangers which threaten it. That is to say, it is no objection to such an exertion of this power that the dangers intended to be avoided arise, in whole or in part, out of matters connected with intrastate commerce." Southern Railway Co. v. United States, 222 U. S. 26, 27, 32 Sup. Ct. 4, 56 L. Ed. 72.

In the Rigsby Case it is not proven nor claimed that the car in which Rigsby was injured was at the time being used in either interstate or intrastate traffic, or even being used at all. The undisputed facts ap-

pear to be that the car was out of use because of defective condition, and had been for more than a month, and at the time Rigsby was hurt was not being moved for use. It was marked or labeled on each side with "bad order" tag, and was being moved from the bad-order track to the railroad shop for the purpose of being repaired and put in order for use. The liability of the railroad company in moving the car is not in any wise claimed as based upon *use* of the same, and only because in moving the car to the shop for repairs it was for a very short distance required to be removed over a portion of the main track, so as to reach the railroad shop. To move the car to the shop was the only way the car could be put in order for use in any traffic. It could hardly have been intended by the Congress that a railroad company under heavy penalties should keep its cars in perfect order, with certain specific safety appliances and otherwise, and yet that, after a disabled car has been taken entirely out of commerce, not to be used for any traffic whatever, the railroad company is to be penalized in favor of employés fully advised and warned that the car was in bad order and was to be moved only to the shop for repairs, for taking the only practical means at hand to have the car repaired and put in order.

Certainly, under the harshest view to be taken of the requirements of the act of Congress, to penalize the railroad the out-of-order or disabled car must be *used* on a railroad engaged in interstate commerce; and in the Rigsby Case the question was whether the disabled car on which Rigsby was injured was at the time being *used* within the meaning and purview of the said act of Congress, and this under the evidence in the case was a question of fact which should have been submitted to the jury.

For error in directing the verdict, the case should be reversed.